IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN RE:  REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE, AND ERISA LITIGATION | ) ) ) ) |
| CONSULTING SERVICES GROUP, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case Nos. 10-02045 |
| MORGAN KEEGAN & CO., INC.; MORGAN ASSET MANAGEMENT, INC., REGIONS FINANCIAL CORP.; and JAMES C. KELSOE, JR., | ) MDL 2009 ) ) ) ) ) |
| Defendants. | ) |

**ORDER GRANTING PLAINTIFF'S MOTION TO REMAND**

Before the Court is Plaintiff Consulting Services Group, LLC's ("CSG") February 3, 2010, Motion to Remand.  (See Plaintiff's Motion to Remand, Dkt. No. 4.) ("Pl's Mot.") Defendants Morgan Keegan & Co., Inc. ("Morgan Keegan"); Morgan Asset Management, Inc. ("Morgan Asset"); Regions Financial Corp. ("Regions"); and James C. Kelsoe, Jr., filed their joint response in opposition on February 17, 2010.  (See Defendants' Response in Opposition to Motion to Remand, Dkt. No. 8.) ("Defs' Resp.")  Plaintiff asserts that, because its Complaint does not reference federal law, it has not stated a federal cause of

action, thus depriving this Court of jurisdiction. (Pl's Mot. at 1-2.) Plaintiff also seeks an award of attorneys' fees for Defendants' "unjustified removal" of its suit. (Id. at 1); see 28 U.S.C. § 1447(c). Because Plaintiff's Complaint fails to raise a substantial question of federal law, the Court does not have federal question jurisdiction and GRANTS the Motion to Remand. Plaintiff's Motion for attorneys' fees is DENIED.

**I.   BACKGROUND**

CSG is a Memphis, Tennessee-based investment consulting firm that provides guidance to institutional and private clients. (Compl. ¶ 1.) Founded in 1990, it is a registered investment advisor with the Securities and Exchange Commission. (Id.) CSG began to track the performance of funds managed by Defendant Kelsoe in 1992. (Id. ¶ 8.) Kelsoe worked for or was an agent of Morgan Keegan, Morgan Asset, and Regions. (Id. ¶ 6.) Kelsoe specialized in "high yield, fixed-income portfolio management," and CSG's monitoring of his funds led it to believe that Kelsoe was a highly competent investment manager. (Id. ¶¶ 8-9.) CSG developed a relationship with Kelsoe, Morgan Keegan, and Morgan Asset that allowed CSG's clients to place their money in separate accounts under Kelsoe's management. (Id. ¶ 9.)

This business relationship continued unchanged until March 1999, when Morgan Keegan and Morgan Asset limited the ability of outside clients to use Kelsoe as an account manager.

Simultaneously, Morgan Keegan began to offer two Kelsoe-managed open-end investment funds:  the Regions Morgan Keegan Select High Income Fund and the Regions Morgan Keegan Select Intermediate Fund (collectively, the "Funds").[1]  Morgan Keegan was the exclusive purveyor of the Funds.  (Id. ¶ 10.)  CSG understood that Kelsoe would manage the Funds in the same manner as his other prior investment accounts.  Indeed, Kelsoe had created the Intermediate Fund's portfolio based on a model portfolio he had created for one of CSG's institutional clients. (Id.)  CSG entered into a commission-sharing agreement with Morgan Keegan whereby all Fund transactions by CSG clients who did not have pre-existing relationships with Morgan Keegan would result in commissions split between the two firms.  (Id. ¶ 14.)

CSG alleges that, between March 1999 and July 2008, Defendants fraudulently induced it to recommend the Funds to its clients and to hold those investments as the Funds' share prices declined precipitously.  (Id. ¶ 16.)  From March 31, 2007 to March 31, 2008, the Funds lost more than $2 billion in value. (Id. ¶ 17.)  Although the markets as a whole experienced a significant decline because of the credit crisis, CSG asserts that the Funds' losses were not a result of normal market factors.  (Id.)  Instead, CSG alleges that the Funds declined

---

[1] Morgan Keegan later expanded its offering of Funds Kelsoe managed to six. (Compl. ¶ 17.)

3

because of their investment in numerous low-priority tranches[2] of asset-backed securities. These low-quality, high risk investments were the opposite of the "high-yield, fixed-income, corporate debt, and asset-backed securities" in which Kelsoe repeatedly told CSG the Funds were invested. (Id. ¶ 18.)

Kelsoe allegedly told CSG during his quarterly communications with the firm that the Funds were more "stable" than their peers. (Id.) He also asserted that the assets backing the securities were "over-collateralized," meaning that the underlying assets were worth more than the securities they backed. Thus, Kelsoe convinced CSG that its clients' money was safe. (Id. ¶¶ 18, 21.) In truth, CSG alleges that "[n]one of the . . . Funds were [sic] actually high yield bond funds" and that the peer funds selected by Defendants for comparison purposes were misleading. (Id. ¶¶ 24-25.) CSG also asserts that, Kelsoe's claims of "over-collateralization" to the contrary, the Funds exposed CSG's clients to risks of between ten and twenty times the value of the underlying assets. (Id. ¶ 27.) Morgan Asset and Kelsoe "fraudulently concealed that the

---

[2] "Tranche" is the French world for "slice." In the field of investments, tranche refers to a security that its sellers split into smaller pieces to be sold to investors. Where the security is an asset-backed security, like those at issue here, each tranche has different rules for paying its investors. The "top" tranche contains the safest securities, and its investors receive principal and income payments first. The lowest tranche contains the riskiest securities. Its investors receive payment only if all investors in the higher tranches are paid first. Thus, if borrowers default on the assets backing the securities, those who have invested in the lowest tranches bear any losses first. (See Compl. ¶ 27 n.1.)

4

RMK Funds had invested a <u>substantial majority</u> of the[ir] portfolios in low-priority tranches." (Id. ¶ 30 (emphasis in original).) For example, at least 138 of the 161 asset and mortgage-backed securities held by the Regions Morgan Keegan Select High Income Fund were low-priority tranches exposed to significant credit risk. (Id. ¶ 31.)

The Funds' share prices experienced significant declines in mid-2007, leading CSG to speak with Kelsoe by telephone on July 3, 2007. Kelsoe told CSG that any risks associated with the growing mortgage crisis were no longer a risk "going forward" and that less than 15% of the Funds' portfolios were mortgage-backed products. (Id. ¶ 34.) Kelsoe continued to reassure CSG through the remainder of 2007 that the Funds' investments were solid and that, as proof, CSG should "watch the dividend." (Id. ¶ 39.) By the summer of 2007, however, CSG asserts that the dividend was "artificial" – the Funds were using their principal to pay income to investors and to disguise their deteriorating financial situation. (Id.) CSG also maintains that the majority of the Funds' assets consisted of investments in mortgages by June 30, 2007. (Id. ¶ 33.)

The Funds continued to drop in value, causing CSG again to confer with Kelsoe in August 2007. Kelsoe told CSG that Morgan Keegan would take action to provide liquidity and support for the Funds. (Id. ¶ 41.) Despite these repeated assurances that

5

the Funds had Morgan Keegan's full support, Morgan Keegan removed the Funds from its own model asset allocation and directed brokers in its Wealth Management Group to divest its clients' holdings in the Funds. (Id. ¶ 42.) Regions' trust department took similar action. (Id.) Once these preferred customers of Morgan Keegan and Regions had divested their holdings in the Funds, Morgan Keegan removed its promised liquidity support. (Id. ¶ 43.) Shortly thereafter, CSG was no longer able to speak to Kelsoe directly. (Id. ¶ 44.) By March 2008, the six Funds had collapsed, causing CSG's clients to lose almost their entire investment. (Id. ¶ 48.) Two clients specifically terminated their relationship with CSG because of its failure to provide accurate advice about the Funds, and CSG damaged its goodwill with its remaining clients. (Id.)

On December 22, 2009, CSG filed suit in the Circuit Court for Shelby County, Tennessee. CSG asserted state-law claims of fraudulent concealment; breach of fiduciary duty; intentional interference with business relationships; violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104; negligent supervision; and conspiracy. (Compl. ¶¶ 57-79.) CSG seeks compensatory and punitive damages in an unspecified amount. (Id. ¶ 79.) Defendants removed the suit to this Court on January 21, 2010, asserting federal question jurisdiction.

(Notice of Removal, Dkt. No. 1.)  Plaintiff has filed the present Motion to contest this Court's jurisdiction.

## II. STANDARD OF REVIEW

On a motion to remand, the defendant bears the burden of establishing that removal was proper.  Long v. Bando Mfg. of Am., Inc., 201 F.3d 754, 757 (6th Cir. 2000).  Removal under 28 U.S.C. §§ 1441 and 1446 is appropriate when federal jurisdiction existed at the time of removal, without consideration of subsequent events.  Williamson v. Aetna Life Ins. Co., 481 F.3d 369, 375 (6th Cir. 2007).  "The removal petition is to be strictly construed, with all doubts resolved against removal."  Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit, 874 F.2d 332, 339 (6th Cir. 1989) (citing Wilson v. USDA, 584 F.2d 137, 142 (6th Cir. 1978)).  Removal jurisdiction requires a defendant to show that a federal court has original jurisdiction over the action, either through: (1) diversity of citizenship under 28 U.S.C. § 1332; or (2) federal question jurisdiction under 28 U.S.C. §§ 1331, 1441.

## III. ANALYSIS

### A. When Federal Question Jurisdiction Exists

A defendant's right to remove an action originally filed in state court is statutory.  See 28 U.S.C. § 1441.  Where, as here, defendants seek to remove a suit to federal court based on federal question jurisdiction, they may do so only where the

7

suit "aris[es] under the Constitution, treaties or laws of the United States."[3] Id. § 1441(b); see also 28 U.S.C. § 1331. It is well settled that the jurisdiction conferred by § 1331 is narrower than that allowed by Article III, Section 2 of the Constitution. See Merrell Down Pharms., Inc. v. Thompson, 478 U.S. 804, 807 (1986). For a suit to arise under federal law, one of three preconditions must exist: 1) federal law creates the plaintiff's cause of action; 2) plaintiff's right to relief under state law requires resolution of a substantial federal-law question actually in dispute; or 3) the claim is in substance one of federal law. City of Warren v. City of Detroit, 495 F.3d 282, 286 (6th Cir. 2007).

Where federal law does not expressly create a plaintiff's cause of action, a court looks to the face of a plaintiff's well-pleaded complaint to determine whether federal-question jurisdiction is appropriate. Franchise Tax Bd. v. Const. Laborers Vacation Trust, 463 U.S. 1, 9 (1983). Specifically, the court examines "what necessarily appears in the plaintiff's statement of his own claim" in his complaint. Id. at 10 (internal quotation marks and citation omitted). The plaintiff is the master of his complaint. When an aggrieved party may

---

[3] Defendants cannot remove CSG's suit based on this Court's diversity jurisdiction because Plaintiff CSG and Defendants Morgan Keegan and Morgan Asset have their principal places of business in Memphis, Tennessee. (See Compl. ¶¶ 1-2, 4); see also Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806) (interpreting the statutory grant of diversity jurisdiction to require complete diversity among the parties).

8

bring an action under both state and federal law, he may choose to limit his remedy to that provided by state law. Loftis v. United Parcel Serv., Inc., 342 F.3d 509, 515 (6th Cir. 2003). However, a plaintiff runs the accompanying risk that his federal claims may later be precluded. Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 366 (5th Cir. 1995).

The defendant must demonstrate that the asserted federal element is "an essential one[] of the plaintiff's cause of action" for federal jurisdiction to lie. Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936). A defendant may not establish jurisdiction based on a theory not advanced by the plaintiff in his complaint. Merrell Dow, 478 U.S. at 809 n.6. Nor may a defendant remove a case based on a federal defense, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987) (citation omitted). Determining whether federal question jurisdiction exists is ultimately a question of judgment where a court must "pick[] the substantial causes [of action] out of the web and lay[] the other ones aside," and then balance Congressional intent, judicial power, and federalism concerns. Franchise Tax Bd., 463 U.S. at 20-21 (internal quotation marks and citation omitted); see also Merrell Dow, 478 U.S. at 810. There is no "single, precise, all-embracing test"

9

to determine when federal-law issues imbedded in state-law claims trigger federal jurisdiction. Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005) (internal quotation marks and citation omitted).

### B. Defendants Have Failed to Establish Federal Question Jurisdiction

Defendants assert that Plaintiff's Complaint raises substantial questions of federal law. (Defs' Resp. at 1.) Defendants argue that, because federal regulations govern the Funds, Plaintiff's allegations about the Funds' lack of liquidity and diversification necessarily call into question the federal standards governing those conditions. (Id. at 6-7.) Plaintiff responds that it can succeed on its state-law causes of action without proving any violations of federal law and that its suit, therefore, is not removable. (Pl's Mot. at 6-9.)

In the majority of cases where defendants base removal on federal question jurisdiction, a federal law creating the cause of action provides the necessary disputed federal issue. See Grable & Sons, 545 U.S. at 312. None of Plaintiff's causes of action arises under federal statutory law. All arise under the common or statutory laws of the state of Tennessee. (Compl. ¶¶ 57-79.) Defendants nevertheless argue that any court will have to determine disputed issues of federal law – such as whether Defendants violated regulations governing the pricing of the

10

Funds' shares and the required level of liquidity – to determine whether Defendants are liable. (Defs' Resp. at 6-7.) Defendants' arguments are unpersuasive.

The Supreme Court has repeatedly instructed that "it takes more than a federal element 'to open the "arising under" door.'" Empire HealthChoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 701 (2006) (quoting Grable & Sons, 545 U.S. at 313). To succeed on its state-law claims, CSG does not need to prove that Defendants violated any federal statute or standard. Rather, CSG alleges that Defendants violated the duties Tennessee common law creates when a fiduciary relationship exists. (Compl. ¶¶ 62-65.) Plaintiff need only prove that it has suffered a loss because "of an unfair or deceptive act or practice" to prevail on its Tennessee Consumer Protection Act claim. Tenn. Code Ann. § 47-18-109(a)(1). Fraudulent concealment requires CSG to prove that 1) the Defendants had a duty to disclose a known fact or condition; 2) they failed to do so; 3) CSG reasonably relied on Defendants' misrepresentations; and 4) that reliance caused it injury. Stanfill v. Mountain, 301 S.W.3d 179, 185 (Tenn. 2009). There is no requirement that federal law create the underlying duty. State fiduciary duties suffice. See id. The common law torts of intentional interference with a business relationship, negligent supervision, and conspiracy also require CSG to prove no federal elements. See Trau-Med of Am., Inc. v. Allstate Ins.

11

Co., 71 S.W.3d 691, 701, 703 (Tenn. 2002) (intentional interference with a business relationship and civil conspiracy); Jones v. Bedford County, No. M2009-01108-COA-R3-CV, 2009 Tenn. App. LEXIS 844, at *12-13 (Tenn. Ct. App. Dec. 15, 2009) (negligent supervision). Defendants intend to argue that they cannot be liable because they abided by all applicable federal regulations. (Defs' Resp. at 9-13.) Their proposed arguments are defenses.

For more than a century, it has been clear that a party may not invoke federal jurisdiction on the basis of a defense – even one that is certain to be asserted. "[T]he right of the plaintiff to sue cannot depend on the defense which the defendant may choose to set up." Tennessee v. Union & Planters' Bank, 152 U.S. 454, 459 (1894) (internal quotation marks and citation omitted); see also Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908) ("[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution."). Tennessee law governs whether Defendants' actions constitute fraud. Defendants' argument that federal regulations necessarily establish the governing standard of care fails because Plaintiff fails to claim that Defendants have violated any federal law. At most, federal regulations would provide evidence about

whether Defendants have met the applicable standard of care. That is not sufficient to establish federal question jurisdiction. See Grable & Sons, 545 U.S. at 313 (holding that a party must show more than the "mere need to apply federal law in a state-law claim" to establish federal question jurisdiction).

Were the Court to accept Defendants' assertion that the potential need to apply federal law to analyze Plaintiff's state-law claims triggers federal jurisdiction, it would be nearly impossible to assert a state-law fraud claim against a securities dealer and remain in state court. Thus, claims currently handled by state courts would fall within the federal courts' purview. If Congress had intended such a dramatic shift in the relative responsibilities of the state and federal courts, it would have said so explicitly. Grable & Sons, 545 U.S. at 318 (Congress must provide an explicit "welcome mat" where accepting federal jurisdiction would "attract[] a horde of original filings and removal cases raising . . . state claims with embedded federal issues"). That Congress intended no such shift is shown by its instruction that even federal claims made solely under the Securities Act of 1933 may not be removed from state court. See 15 U.S.C. § 77v(a). Even assuming that Plaintiff's suit raises a contested, substantial question of federal law, the dramatic shift Defendants' argument would cause

13

in the sound division of labor between state and federal courts vetoes federal question jurisdiction in this case. See Grable & Sons, 545 U.S. at 313-14 (discussing the "veto"); see also Mikulski, 501 F.3d at 560 ("[S]tate courts are generally presumed competent to interpret and apply federal law." (citing Zwickler v. Koota, 389 U.S. 241, 245 (1967))).

### C. Attorneys' Fees Are Not Appropriate

CSG asks for its attorneys' fees and costs for litigating this "unjustified removal." (Pl's Mot. at 1.) The extensive analysis required to determine whether removal was proper demonstrates that, although ultimately unsuccessful, Defendants did not "lack[] an objectively reasonable basis for seeking removal" to federal court. Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005). CSG has not pointed to any "unusual circumstances" warranting an award of attorneys' fees under 28 U.S.C. § 1447(c). Martin, 546 U.S. at 141. Indeed, other than the initial request for fees on the first page of its Motion to Remand and a reiteration of that request in the Motion's final paragraph, CSG makes no substantive argument about why a fee award would be appropriate. (See Pl's Mot. at 1, 9.) CSG's Motion for attorneys' fees and costs is DENIED. See Martin, 546 U.S. at 141 ("Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").

14

**IV. CONCLUSION**

Defendants have not demonstrated that any of Plaintiff's claims satisfies the requirements for the "special and small category" of cases that necessarily raise the substantial, disputed issue of federal law required to trigger federal jurisdiction. Empire HealthChoice, 547 U.S. at 699. Therefore, Plaintiff's Motion to Remand is GRANTED, and this matter is REMANDED to the Circuit Court for Shelby County, Tennessee. Plaintiff's request for attorneys' fees and its costs is DENIED.

So ordered this 2nd day of July, 2010.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE